# In the United States Court of Federal Claims

No. 01-27

(Filed: May 25, 2011)

* * * * * * * * * * * * * * * * * * * *

PLACER MINING CO., INC.,
d/b/a THE NEW BUNKER HILL
MINING CO.,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

* * * * * * * * * * * * * * * * * * * *

Fifth Amendment taking; CERCLA remediation; mining; *Lucas*; background principles of state law; nuisance; property access; distinguishing tort from taking

*Paul S. Harter,* Phoenix, AZ, for plaintiff.

*John S. Most*, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., with whom was *Ignacia S. Moreno*, Assistant Attorney General, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

Plaintiff seeks compensation under the Fifth Amendment of the United States Constitution for the alleged taking of its property. Currently before the court are defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment, both pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The motions are fully briefed and we heard oral argument on April 4, 2011. For the reasons explained below, we deny both motions.

1

FACTUAL BACKGROUND[1]

This case concerns a mining operation in a mountainous region of northern Idaho. Placer Mining Co., Inc. ("Placer Mining") purchased this operation in 1991, nearly a century after the mine commenced operations. Opened in 1886, the Bunker Hill Mine was, in its heyday, one of the world's largest sources of silver, zinc, and lead, eventually expanding more than a mile below ground and including 30 levels and 150 miles of tunnels. Throughout the early decades of the mine's operation, and prior to Placer Mining's ownership, mine waste was dumped in and around local water sources and was ultimately spread throughout the floor of the nearby valley where the towns of Wardner and Kellogg, Idaho, are located. Over the years, the contamination worsened as the mine operation expanded to ore processing and related industrial enterprises, including smelting operations, two sulfuric acid plants, a phosphoric acid plant, and a fertilizer plant.

During the 1960s and 1970s, concern grew over the health and environmental impact of the contamination buildup and increasing emissions. In 1974 and 1975, the State of Idaho and the federal Environmental Protection Agency ("EPA") conducted studies documenting the serious health risks posed by lead contamination in the area, particularly for children living in the vicinity of the smelter. A subsequent study in 1982 revealed reduced, though still high, levels of lead in the area.

In 1983, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, the EPA placed the Bunker Hill Mine on the National Priorities List, which identifies serious hazardous material threats that, while not immediately life-threatening, need long-term remedial response actions. The following year, the EPA and state authorities began studies to determine appropriate long-term remedies for the Bunker Hill site. In the interim, the EPA and the state, in conjunction with past and then-current mine owners, undertook several shorter-term removal actions. As part of these efforts, the EPA issued several Unilateral Administrative Orders between 1989 and 1991, requiring the mine owners to cease certain actions and to undertake others believed to prevent or curtail the release of hazardous substances.

---

[1] The facts, which are uncontroverted unless otherwise noted, are taken from plaintiff's response to defendant's requests for admissions and from plaintiff's counter-statement of facts filed in support of its cross-motion.

In 1991 and 1992, based on the results of the long-range studies, the EPA and Idaho selected long-term remedies for the contaminated areas. One of these involved Milo Creek, a mountainous stream which, during times of heavy rain or runoff, could carry rocks, sediment, and contaminated materials down into the valley below. Of particular import, the creek flows through an area known as the Reed Landing, a structure of uncertain vintage constructed by previous mine owners. The landing consists of a 100-foot timber wall behind which rock and other material was filled,[2] providing a relatively large and level area in otherwise steeply sloped terrain. The landing provides the only flat staging and storage location as well as access to portals into the mine's workings. When the landing was constructed, buried within it was a tunnel-like culvert designed to convey the waters of Milo Creek down through the landing's fill material and out into the natural creek bed downstream. The remedy proposed by EPA was for Milo Creek, including the portions above, on, and below the landing, to be channelized and lined, *i.e.*, for the existing creek bed to be replaced with a concrete channel, thus minimizing the creek water's contact with contaminated material.

In May of 1997, before the various long-term remedies were implemented, the region suffered a catastrophic flood. This flood was precipitated by record winter snowfall, which was preserved by a cool spring that ended in a sudden warm spell and torrential rains. The resulting flood carried contaminated materials downstream into the neighboring towns where the water quickly overwhelmed the system of channels, pipes, and culverts that normally conveyed it. Compounding the problem, the water system's large metal debris screens, known as grizzlies, became clogged, forcing flood waters out of their usual channels and into surrounding areas. Dozens of homes and several miles of streets were damaged, and the towns were inundated with flood waters carrying lead-contamination sediment.

In the wake of this flood, the President issued a disaster declaration, initiating a FEMA response. In conjunction with FEMA, the Idaho Bureau of Disaster Services designed a solution for the Milo Creek, which it implemented. The EPA, however, was concerned that this solution was insufficient to handle a "100-year event" such as the recent flood. Accordingly, the EPA issued a Unilateral Administrative Order requiring

---

[2] The parties disagree whether the fill material was contaminated mine waste or merely blasted rock and other benign material.

Placer Mining to provide unrestricted access to its property. Placer Mining acquiesced under protest.

The EPA proceeded to demolish both the timber wall supporting the Reed Landing and the ore loading chutes located on the landing and, after allowing the landing to stabilize, rerouted the existing road. The EPA also replaced the creek bed of Milo Creek with an open concrete channel approximately 2,300 feet long, about 200 feet of which crosses the surface of the Reed Landing. The concrete channel is eight feet wide, although the actual footprint of the channel, including the sidewalls is eleven feet wide. Along each side of the channel is a fence about four feet tall, designed to prevent people or animals from falling into the creek channel. Spanning the channel, which effectively bisects the landing, is a 20-foot-wide bridge designed to allow access across the creek and to the mine. At some point during this process of demolition and construction, and for reasons disputed, the Reed Portal, the sole access point to some of the mine's underground workings, collapsed.

Placer Mining filed suit here in 2001, claiming a taking of its property arising from several causes of action. There followed extensive settlement attempts and a lengthy stay of proceedings during which Placer Mining attempted to negotiate a sale of the property to a third party. In March of 2010, Placer Mining indicated its intent to pursue only three of its claims: (1) the access claim, *i.e.*, that the concrete channel denies effective use of the landing and access to parts of the mine, (2) a claim that the EPA physically took approximately 40,000 tons of stockpiled ore stored on the landing, and (3) that the EPA's work caused the collapse of the Reed Portal.

The government has moved for partial summary judgment on the first and third causes of action.[3] As to the access claim, the government argues that the remedial construction was not a taking since Placer Mining had no right to maintain its property in a manner causing a public health hazzard. As to the collapse of the Reed Portal, the government argues that this claim—which the complaint mistakenly refers to as the Russell Portal—was never plead and is thus barred by the statute of limitations and that, in any event, the claim sounds in tort and is thus not property before this court. Placer Mining responded and cross-moved for partial summary judgment as to both claims.

---

[3] The second claim, the taking of the stockpiled ore, is not addressed by the pending motions.

DISCUSSION

We have jurisdiction under the Tucker Act, which gives this court exclusive jurisdiction over Fifth Amendment takings claims against the United States for amounts greater than $10,000. *See* 28 U.S.C. § 1491 (2006); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citing *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1383 n.10 (Fed. Cir. 2000) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000.")).

Placer Mining does not, and cannot here, challenge the propriety of the remediation effort. *See Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("[I]n a takings case we assume that the underlying governmental action was lawful."); *Americopters, LLC v. United States*, 95 Fed. Cl. 224, 229 (2010). Rather, it must assume the legitimacy of the government's action and allege, on that basis, that the agency's actions caused a taking in violation of the Fifth Amendment. The Fifth Amendment states in pertinent part that private property shall not "be taken for public use, without just compensation." U.S. Const. amend V. A property owner may recover the value of property taken by the government even where there was no formal exercise of the power of eminent domain. *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing *United States v. Clarke*, 445 U.S. 253, 257 (1980)).

Compensable takings include both physical takings, in which the government physically invades or appropriates private property, and regulatory takings, in which government regulations unduly burden private property to the point of diminishing its utility or value. *See Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir. 2008). Here, Placer Mining alleges a physical taking. *See Stearns Co., Ltd. v. United States*, 396 F.3d 1354, 1357 (Fed. Cir. 2005) (citations and internal quotation marks omitted) ("A physical taking occurs when the government itself occupies the property or requires the landowner to submit to physical occupation of its land.").

Summary judgment is appropriate only if the record indicates there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Moden*, 404 F.3d at 1342. Whether a compensable taking has occurred is a "question of law based on factual underpinnings." *Ridge Line, Inc. v. United States*, 346, F.3d 1346, 1352 (Fed. Cir. 2003). "[D]ue to the fact-intensive nature of takings cases, summary

judgment should not be granted precipitously." *Moden*, 404 F.3d at 1342 (citing *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983)). Although the inquiry is "essentially ad hoc [and] factual," it "is not standardless." *Loretto v. Teleprompter Manhatten CATV Corp.*, 458 U.S. 419, 426 (1982).

I. The Access Claim

Placer Mining's first claim is that the concrete channel and the allegedly insufficient bridge crossing it restrict use of the landing and, more importantly, effectively deny access to the mine entrances on the other side of Milo Creek. The government concedes it constructed the complained-of structure but argues that Placer Mining has not been deprived of any compensable property interest. Specifically, the government argues that a landowner has no right to maintain property in a condition that is a nuisance or hazzard and that the subsequent government abatement of the nuisance is not a taking. The government's argument misses the gravamen of plaintiff's complaint.

There is no question that the Fifth Amendment "protects interests in real property, such as the Owners' interests in the land and buildings." *Chancellor Manor v. United States*, 331 F.3d 891, 902 (Fed. Cir. 2003) (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016 n.7 (1992)). As already noted, Placer Mining is alleging a physical taking, which usually entails a simpler analysis than a regulatory taking. As a general matter, all physical takings are compensable, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it." *Lucas*, 505 U.S. at 1015; *see Loretto*, 458 U.S. 419.[4] In other words, "physical takings constitute per se takings and impose a 'categorical duty' on the government to compensate the owner." *CRV Enter. Inc. v. United States*, 626 F.3d 1241 (Fed. Cir. 2010) (citing *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-23 (2002)).

---

[4] In contrast, when considering an alleged regulatory taking, "a court must typically conduct a complex factual assessment to determine whether compensation is owed to the property holder," *Bass Enter. Prod. Co. v. United States,* 381 F.3d 1360, 1365 (2004) (citations omitted), and will apply a categorical rule of compensation only when the regulation causes a permanent deprivation of all productive or economically beneficial use of the property, *id.* (citing *Lucas*, 505 U.S. at 1017).

Here, the government concedes it came onto plaintiff's land but argues that the categorical rule requiring compensation for physical invasion is subject to exception. This argument—that Placer Mining has not been deprived of any property interest because a landowner has no right to maintain a nuisance on his property—is based on a rule derived from regulatory takings cases, particularly *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Though the government assumes that this rule is properly applied here, we note that the rule's applicability to physical takings is far from settled.

In *John R. Sand & Gravel Co. v. United States*, this court confronted facts quite similar to those here: mining operations that prompted CERCLA remediation efforts and led to a subsequent takings suit. 60 Fed. Cl. 230 (2004). In its argument to the trial court, the government presented a defense markedly similar to that proffered here, namely that because there was no right to maintain a nuisance, no property interest had been taken. The court carefully and thoroughly considered the arguments, concluding that "the background principles exception can apply to physical takings cases." *Id.* at 239. On appeal, the Federal Circuit reversed and remanded for dismissal based on plaintiff's failure to file within the limitations period. The Federal Circuit expressly declined to consider "whether background principles of nuisance and property law, as articulated in *Lucas*, apply in physical takings." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1360 (Fed. Cir. 2006). Thus, the question of *Lucas'* applicability to physical takings is still an open one.[5]

Regardless of whether the nuisance exception applies to physical takings, the government's reliance on this argument fails to squarely meet plaintiff's complaint. The nuisance exception might justify the government's entry onto plaintiff's land and all necessary remediation efforts, including construction of a concrete channel. Placer Mining, however, is not challenging the remediation work itself but is alleging that the concrete channel and the allegedly inadequate bridge over it have effectively denied its *access* to the

---

[5] *Hendler v. United States*, a case briefed by neither party here, is merely persuasive when it states that "the nuisance exception applies equally to physical taking and regulatory taking analysis." 36 Fed. Cl. 574, 586 (1996). *See West Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (citations omitted) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court.").

mine. We believe that this claim, which is distinct from the abatement itself, is not amenable to summary judgment.

As already discussed, we employ a two-step analysis when considering an alleged taking. *Am. Pelagic Fishing Co., L. P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). The first step is to examine what was allegedly taken and determine if plaintiff has a cognizable property interest in it. *Id.* In determining whether a cognizable property interest exists, we look for "crucial indicia of a property right," such as the ability to sell, assign, transfer, or exclude. *Conti v. United States*, 291 F.3d 1334, 1342 (Fed. Cir. 2002). In addition, the court will determine whether the use "was part of the owner's title to begin with, *i.e.*, whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner." *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995) (citing *Lucas*, 505 U.S. at 1027). The second step is to determine whether that interest was taken.

Here, plaintiff claims an interest in "access" to the mine workings, a claim we think better articulated as an interest in the unfettered ability to use, enjoy, and dispose of its property. Placer Mining argues, and the government concedes, that it is not barred by law from conducting commercial mining operations on its property. Although there is no legal impediment to further mining, Placer Mining claims that the concrete channel and bridge constitute a practical, physical barrier preventing large-scale mining development of the property.

A landowner clearly has a right to use and possess its property in the ways it sees fit, so long as those uses are not injurious to the public. *Loretto*, 458 U.S. at 435 (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945)) ("Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'"); *M&J Coal*, 47 F.3d at 1154 (recognizing mine owner's right to mine but conditioning right on not endangering public health and safety). "Although deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, it is clearly relevant." *Loretto*, 458 U.S. at 436 (internal citation omitted). Here, the government has not alleged that, if plaintiff were operating a nuisance, it could only have been abated by the channelization and the particular bridge actually built. Accordingly, we believe it is clear that Placer Mining has a property interest in the use of its property as a commercial mining operation—a use which has at no time been prohibited and which is not an inherent nuisance—which is distinct from the

conditions that prompted the CERCLA remediation work and is not susceptible to the government's nuisance defense.[6]

Having identified the property interest at stake, we must determine if it was taken. Here, there are factual issues as to whether the government's physical invasion has taken plaintiff's interest in the use of its property by eliminating all feasible access to the property. For example, the parties disagree whether the bridge spanning the concrete channel is adequate to support the use envisioned by plaintiff. The government argues the bridge currently in place is sufficient to support vehicles up to the size of a 12-cubic-yard dump truck, claiming this is sufficient for future mining operations. Plaintiff argues that the bridge is insufficient to support the far larger vehicles and equipment it claims are standard to modern mining operations. In addition, it is unclear if other routes of ingress to the mine workings are a feasible alternative. Thus this issue is not amenable to resolution by summary judgment.

II.   The Reed Portal Claim

The third claim that plaintiff intends to pursue in this litigation, and the final one subject to the pending cross-motions, is based on the collapse of the Reed Portal. As an initial matter, the government argues that this claim was not plead in the complaint and is now barred by the statute of limitations. Placer Mining responds that the complaint simply misidentified the Reed Portal, referring mistakenly to the Russell Portal, and argues that throughout the course of this litigation the parties have clearly understood that it is the Reed Portal that is the subject of the claim here. We do not agree with the government that this claim is irretrievably barred by statute of limitations; rather, plaintiff could resolve this issue by the simple expedient of amending the complaint, *see* RCFC 15(b)(2), which would relate back to the date of the complaint, as this claim arises from same transaction or occurrence. RCFC

---

[6] The outcome is the same if we frame the issue, as plaintiff does, as a denial of access. "Government action that cuts off or denies 'all feasible routes' of access to a plaintiff's property can constitute a taking." *McGuire v. United States*, 97 Fed. Cl.425, 439 (2011) (citing *Laney v. United States*, 661 F.2d 145, 149 (Ct. Cl. 1981)); *see also Foster v. United States*, 607 F.2d 943 (Ct. Cl. 1979); *Sacramento Grazing Ass'n, Inc. v. United States*, 96 Fed. Cl. 175, 194 (2010) (citing *Foster*, 607 F.2d at 949-50) ("[A] physical taking occurs if the Government denies an owner all access to a property interest.").

15(c)(1)(B). Such amendment would not prejudice the government, which has had sufficient notice of the true nature of plaintiff's claim.

A more significant issue, however, is the government's argument that this claim alleges a tort rather than a taking and thus we have no jurisdiction over it. Distinguishing between torts and takings can be a difficult exercise, in part because "'[i]nverse condemnation law is tied to, and parallels, tort law.'" *Ridge Line v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (quoting 9 *Nichols on Eminent Domain* § 34.03[1] (Patrick J. Rohan & Melvin A. Reskin eds., 3d ed. 1980 & Supp. 2002)). The Federal Circuit has articulated a two-part test for distinguishing takings from torts:

> First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1355-56 (internal citations omitted); *see also Moden*, 404 F.3d at 1342.

Here, neither party alleges that the government intended to collapse the portal. Thus, as to the first step, the issue becomes whether the collapse was a direct, natural, or probable result of the authorized and intended actions taking place on the nearby Reed Landing. The Federal Circuit has clarified that an outcome is a direct, natural, or probable result when it is "the foreseeable and predictable result" of the authorized act. *Moden*, 404 F.3d at 1343. We cannot say as a matter of law, based on the pleadings, whether the collapse of the Reed Portal was a foreseeable and predictable result of the EPA's nearby activities—which included removing a 100-foot timber wall supporting the landing, allowing the landing's fill material to settle, and engaging in road construction and heavy concrete work—or if the collapse was the result of negligence or a failure of care.

Nor can we rule as a matter of law that plaintiff has failed to satisfy the test's second prong. Although plaintiff has not alleged any benefit accruing

10

to the government as a result of the collapsed portal, it has alleged that the collapse has preempted use of its property for an extended time. Placer Mining's argument is not that the collapse has merely reduced the value of the mine, but that it has effectively denied entry into and use of the mine for the past decade. *See Ridge Line*, 346 F.3d 1355-56. The government seems to recognize the scope of the allegation in its request for admissions, which states "that the Bunker Hill Mine is *inaccessible* through the Reed Portal because of a collapse in the tunnel leading to the mine from that portal." Def. Mot. for Summ. J. Ex. 3 at 2 (emphasis added). In addition, we note that the parties dispute the facts surrounding the timing, cause, and extent of the collapse. In sum, we cannot say as a matter of law that the collapse of the Reed Portal is a tort over which we have no jurisdiction. Accordingly, we must deny the government's motion.

III.   Other arguments

In its reply brief, plaintiff raises a new argument in support of its cross-motion for summary judgment. We address it but briefly, finding no merit to it. Specifically, Placer Mining argues that in correspondence with the EPA in 1999, the agency's assistant regional counsel conceded that compensation was due, stating that "EPA does not intend to take Mr. Hopper's property without fair compensation, but it is yet to be determined what compensation, *if any*, is due." Pl.'s Reply at 5 (emphasis added). As an initial matter, we note that the alleged concession does not promise payment and explicitly states that it is unclear if any compensation is due. In any event, the outcome of the pending cross-motions is a matter of law and is not affected by an agency employee's unratified comment.

CONCLUSION

For the reasons stated above, we deny both parties' motions for summary judgment. The parties are directed to confer and propose to chambers by June 10, 2011, a schedule for further proceedings in this matter.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge